**UNITED STATES of America,
Plaintiff,**

v.

**Richard D. MARASCO and Angela
D. Harms, Defendants.**

No. 8:05CR381.

United States District Court,
D. Nebraska.

July 24, 2006.

Thomas J. Kangior, Assistant United States Attorney, Omaha, NE, for Plaintiff.

David R. Stickman, Federal Public Defender's Office, John D. McDermott, Omaha, NE, Jay W. Mez, Mez Law Office, Council Bluffs, IA, for Defendants.

**MEMORANDUM AND ORDER**

CAMP, District Judge.

This matter is before the Court on the Report and Recommendation (Filing No. 44) issued by Magistrate Judge Thomas D. Thalken recommending: the motion to suppress filed by the Defendant, Richard D. Marasco, (Filing No. 24), be denied; and the motion to suppress filed by the Defendant, Angela D. Harms, (Filing No. 26), be granted in part and denied in part. The government, Marasco, and Harms each filed a statement of objections to the Report and Recommendation and supporting briefs (Filing Nos. 53 and 54, government; Filing Nos. 49 and 50, Marasco; Filing Nos. 46 and 47, Harms) as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 57.3(a).

The Indictment charges: Marasco and Harms with conspiracy to manufacture 50 grams or more of a mixture or substance containing methamphetamine (Count I); Marasco and Harms with manufacturing 5 grams or more of methamphetamine (Count II); and Marasco and Harms with possessing equipment, chemicals, product and material to manufacture a controlled substance (Count III). Marasco seeks an order suppressing evidence seized during: a March 27, 2005, search of a pick-up truck he was driving in Plattsmouth, Nebraska; a May 20, 2005, search of a residence at 720 1st Ave., Plattsmouth, Nebraska; and an August 24, 2005, search of a motel room at the Offutt Motor Court in Bellevue, Nebraska. (Filing No. 24.) Harms seeks an order suppressing: evidence seized during the August 24, 2005, motel room search; and statements made as a result of the motel room search. (Filing No. 26.)

Following two evidentiary hearings,[1] Judge Thalken issued a Report and Rec-

---

1. The initial hearing was held prior to the Supreme Court's March 22, 2006, decision in

ommendation in which he concluded: Marasco met his burden of showing that he had standing on the evening of March 27, 2005, to contest the search of the pick-up; the March 27, 2005, encounter in the alley with Marasco was consensual and not an investigatory stop or seizure; the observation of materials in the bed of the pick-up together with the strong smell of anhydrous ammonia provided probable cause for the search of the trash bag and the seizure of materials in the pick-up bed; alternatively, in light of the anhydrous ammonia odor, exigent circumstances existed for the search of the pick-up bed; the trash pull at 720 1st Ave., Plattsmouth, Nebraska, supplied probable cause for issuance of the search warrant for the residence; alternatively, assuming that the search warrant affidavit was not based on sufficient probable cause, the *Leon* good faith rule applied, and none of the four exceptions to the good faith rule applied; items seen in plain view while officers were in the motel room arresting Marasco are admissible against both Marasco and Harms; items seized from Marasco's pockets during the search incident to his arrest are admissible; Marasco voluntarily consented to the search of the motel room; Harms objected to officers searching "her stuff," and therefore specific items are not admissible against her; and Harms's statements made to law enforcement after the search of the motel room were fruits of the illegal search and are therefore excluded.

On the basis of these determinations, Judge Thalken recommended that Marasco's motion to suppress be denied and that Harms's motion be granted as to the following: 1) items W–3, W–4, W–9, W–18, and W–21 seized from Room 12 of the Offutt Motor Court on August 24, 2005; and 2) her August 25, 2005, statement made to Detective Simones. Otherwise, Judge Thalken recommended that Harms's motion be denied.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C) and NECrimR 57.3(a), the Court shall make a de novo determination of those portions of the report, findings, and recommendations to which the Defendant has objected. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendations. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## STATEMENT OF FACTS

The Magistrate Judge provided a detailed factual account of the relevant events. The Court has considered the transcripts of the hearings conducted by the Magistrate Judge (Filing Nos. 37, 43). The Court also carefully viewed the evidence (Filing Nos. 35, 40). Based on the Court's de novo review of the evidence and arguments, including the objections to Judge Thalken's factual determinations, the Court adopts Judge Thalken's factual findings in their entirety.

## FACTUAL BACKGROUND

Judge Thalken's Report and Recommendation sets out a thorough statement of facts. Briefly, the facts involve a series of three events. First, on March 27, 2005, Officer Kennan of the Plattsmouth, Nebraska, police department and a certified methamphetamine lab specialist saw a pick-up truck that he thought was driven

---

*Georgia v. Randolph,* — U.S. —, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). (Filing No. 37.) Because the *Randolph* decision encompassed similar issues to those presented in

this case, Judge Thalken scheduled a supplementary hearing allowing the parties the opportunity to present additional evidence and argument. (Filing No. 43.)

by a suspended driver named Saun Mauk. Kennan found that the driver was not in fact Sean Mauk, but while leaving the pick-up he smelled a very strong odor of anhydrous ammonia coming from the bed of the pick-up. The pick-up was driven by the Defendant, Richard D. Marasco, with permission from Marasco's roommate who owned of the vehicle. Another officer arrived. Two patrol cars blocked the path of the pick-up from the alley in which it was stopped to the street. Kennan shined his flashlight into the bed of the pick-up, and saw a black trash bag, a Rubbermaid tote container, and a black bucket that held a bag of Morton Rock salt. Kennan opened the black bag, thinking that the bag was the source of the anhydrous ammonia odor, and inside he found a five-gallon white bucket with a blue liquid. The liquid had a white sediment, and the odor was stronger. Kennan believed he had found an active methamphetamine lab, and he seized the items.

On May 19, 2005, Detective Walker of the Plattsmouth police department applied for and was issued a search warrant for the premises at 720 1st Avenue, Plattsmouth, Nebraska, based on a trash pull that revealed drug and methamphetamine paraphernalia. Some of the items tested positive for methamphetamine. The warrant was executed on May 20, 2005, and numerous items were seized.

On August 24, 2005, Sergeant Wood and other officers of the Bellevue, Nebraska, police department were looking for drug activity in areas including the Offutt Motor Court, a Bellevue motel known for drug activity. Wood saw a 20–county license plate that aroused his suspicions because of the reputation of the motel and because methamphetamine labs recovered from the motel in the past were started by persons from Plattsmouth and the surrounding Cass County area. A 20–county license plate is from Cass County. A check was run on the plate, and the vehicle was found to be registered to Marasco, who was determined to be the subject of an outstanding felony warrant. Officers also learned that Marasco had a drug history. Officers obtained a past booking photograph of Marasco and conducted surveillance at the motel. They saw a Toyota 4Runner arrive and observed Marasco and a woman, later identified as codefendant Angela D. Harms, exit the vehicle and enter room 12. Detective Simones was told by the motel manager that room 12 was rented by Harms. Officers learned that Marasco had a Toyota 4Runner and Harms had a prior methamphetamine arrest. The officers knocked on the door of room 12, and Marasco answered. He was asked to step outside, and instead he stepped back into the room. He was arrested and handcuffed. When asked if he had anything dangerous in the room, he responded that he had acid. Simones asked Harms to step outside, which she did. Harms said that she rented the room and that Marasco had recently paid for another week. She stated that both shared the room equally and came and went as they pleased. When Simones asked Harms for permission to search the room, she answered that she would rather not have officers looking through her "stuff."

While Simones was outside with Harms, Wood searched Marasco's person incident to his arrest. He found baggies of methamphetamine, advised Marasco of his *Miranda* rights, asked him for permission to search the room and stated that Marasco did not need to consent. Marasco told Wood that there was a gas generator and acid in the room.

Simones went into the room and talked with Marasco. When asked who had a room key, Marasco said that he had the only key and kept it with him at all times.

Marasco said that Harms rented the room but he had paid for it. Marasco said that he and Harms shared the room equally, coming and going as they pleased.

Based on Marasco's consent to search, officers searched room 12. Many items of methamphetamine manufacture, actual methamphetamine, and methamphetamine paraphernalia were found. The items are detailed in Judge Thalken's Report and Recommendation. (Filing No. 44, at 7–8.)

Simones went outside and advised Harms of her *Miranda* rights. Harms then made incriminating statements.

## ANALYSIS

Each party has objected to Judge Thalken's Report and Recommendation. The objections are discussed below.

### DEFENDANT MARASCO'S OBJECTIONS

Marasco objects to the following portions of the Report and Recommendation:

1. p. 4—the factual finding that Kennan saw a black bucket containing a bag of Morton rock salt when he shined his flashlight into the bed of the pick-up, because the bucket was in an opaque Rubbermaid tote that had to be opened in order to see the salt;

2. pp. 11–12—the conclusion that the March 27, 2005, encounter between Marasco and Kennan was a consensual encounter and not an investigatory stop, arguing that Marasco was not free to leave;

3. p. 12—the conclusions that the odor of anhydrous ammonia constituted reasonable suspicion of criminal activity justifying Kennan looking into the bed of the pick-up, and that the smell of the anhydrous ammonia together with the materials in plain view in the bed of the pick-up constituted probable cause of meth-

amphetamine manufacturing justifying the search of the items in the bed. Marasco argues that the odor of anhydrous ammonia could have emanated from anywhere in the immediate area, and a black trash bag and a Rubbermaid tote are not indicia of methamphetamine manufacturing;

4. p. 13—the conclusion that the search of the pick-up was justified based on exigent circumstances due to the volatile nature of methamphetamine labs;

5. p. 15—the conclusion that the evidence collected from the trash pull at 720 1st Avenue alone constituted sufficient probable cause to issue a search warrant for the premises, arguing that the evidence recovered from the trash only showed that methamphetamine had been used in the home at some point and not that methamphetamine was then present;

6. p. 15—the conclusions that the evidence recovered from 720 1st Avenue is admissible under the *Leon* good faith rule, and none of the exceptions to *Leon* applies. Marasco argues that the search warrant affidavit is so lacking in probable cause that belief in its existence is entirely unreasonable;

7. p. 17—the conclusion that Marasco's consent for the search of the motel room was voluntary, arguing that the consent was the product of police intimidation; and

8. p. 18—the conclusion that evidence found in the motel room is admissible against Marasco even though Harms refused consent to search the room, arguing that *Georgia v. Randolph*, —— U.S. ——, 126 S.Ct. 1515,

164 L.Ed.2d 208 (2006), does not apply.

## P. 4—Finding that Rock Salt Was in Plain View

Marasco objects to Judge Thalken's factual finding that Kennan saw a black bucket containing a bag of Morton rock salt when he shined his flashlight into the bed of the pickup, because the bucket was inside an opaque Rubbermaid tote that had to be opened in order for him to see the salt.

At the hearing, Kennan testified as follows:

A. I flashed my light into the bed of the pickup.

Q. And what did you initially see upon doing that?

A. I saw a black trash bag which was closed over. I saw a tote, like a Rubbermaid container, and it had a black bucket with Morton rock salt, a bag of Morton rock salt in it.

(Tr. (Filing No. 37), 13:4–8.)

When the Court asked Kennan to describe the Rubbermaid tote, he testified:

A. It's like a storage tote that you could buy at Walmart. People store their clothes in it. It comes with a plastic lid. It's just a Rubbermaid container.

(*Id.*, 25:17–19.)

Kennan described the dimensions of the tote as approximately 1 ½ or 2 feet in height and width, and he testified that one could not see through it. (*Id.*, 26:4–12; 27:13–15.)

Marasco assumes that a lid covered the blue tote and, therefore, Kennan could not have seen the rock salt without opening the tote. (Filing No. 50, at 9.) The Court finds no support for this statement in the evidentiary record. While Kennan described the tote as a type that is purchased with a lid, the record does not indicate that a lid was on the tote seen in the bed of the pick-up. Rather, the evidence shows that when Kennan shined his flashlight in the bed of the pick-up, he saw an opaque blue tote containing a bag of rock salt. The objection is denied.

## Pages 11–12—March 27, 2005, Encounter—Consensual Encounter or Stop

Marasco objects to the conclusion that the March 27, 2005, encounter between Marasco and Kennan was a consensual encounter and not an investigatory stop.[2] Marasco argues that after he pulled into an alley, Kennan parked his car seven or eight feet away, and then Hardy arrived and parked so that Marasco could not have driven out of the alley. Therefore, Marasco reasons that a reasonable person would not have felt free to leave.

 The applicable test is whether, under all of the circumstances surrounding the encounter, a reasonable person would not have felt free to leave. *United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005). The evidence shows that the alley was a public residential alley with one entrance and one exit. (Tr. 15:11–22.) Marasco was not pulled over. Rather, he chose to drive in the alley and park in the alley at the rear of the home in which he was living. (*Id.* 10:10–17; 15:15–19.) Kennan parked at the entrance to the alley without activating his lights or siren. (*Id.*

2. In Marasco's brief, he also argues that Kennan lacked reasonable suspicion to stop the vehicle based on his belief that Sean Mauk was driving the vehicle once Kennan learned that the vehicle was registered to Jerry Beu-

chler. (Filing No. 50, at 7.) The objection is denied, as the knowledge that the vehicle was registered to Beuchler does not negate the possibility that Sean Mauk was driving the vehicle.

10:21–22.) Hardy arrived and parked his vehicle partially in the alley and partially in the street, although it is unclear whether he parked behind Kennan's car or blocking the exit. In any event, Marasco could not have driven out of the alley. (*Id.* 6–14.)

All of the circumstances surrounding this encounter include the facts that Marasco parked near his residence and was not pulled over, and he could have walked into his residence. No lights or sirens were activated. Under the applicable test a reasonable person would have felt free to leave and walk into the residence. The objection is denied.

### Page 12—Odor—Reasonable Suspicion; Odor and Materials—Probable Cause

█ Marasco objects to the conclusion that the odor of anhydrous ammonia that Kennan smelled as he was leaving and walking past the pick-up constituted reasonable suspicion of ongoing criminal activity justifying Kennan looking into the bed of the pick-up. Specifically, Marasco argues that if the smell was strong enough to sting Kennan's eyes and nostrils, he should have smelled it earlier as he was talking with Marasco. If true, those facts would support the argument in favor of reasonable suspicion. Marasco then argues that Kennan previously testified in state court that he did not know origin of the odor, adding that the encounter occurred in an alley where Marasco and Kennan were "undoubtedly" surrounded by "other items" that could have been the source of the odor, such as houses, vehicles, garages or trash cans. (Filing No. 50, at 8.) While Marasco correctly pointed out that Kennan could not recall what other items were in the alley, the record contains no evidence of other items, vehicles, garages, or trash cans in the alley.

Kennan testified at the hearing before Judge Thalken that when he previously testified in state court, he meant that he did not know the specific part of the pick-up from which the odor emanated. His prior state court testimony was that while he was sure it was coming from the back of the truck, the bed of the truck contained items and he was uncertain which item was the source of the smell. (Tr. 24:20–25:12.) Reading Kennan's entire testimony, it is clear that this was his testimony. In other words, he is experienced in his knowledge of methamphetamine labs, and he knew that a strong odor of anhydrous ammonia, used to make methamphetamine, was coming from one of the objects in the bed of the pick-up. The objection that the odor did not give rise to reasonable suspicion is denied.

█ Marasco also argues that the odor and the materials in the back of the pick-up, *i.e.*, the black trash bag and Rubbermaid container, did not provide probable cause for a search of the trash bag and the tote. The applicable test in a situation involving the automobile exception to the warrant requirement is whether Kennan had probable cause to believe the vehicle contained contraband before he searched the vehicle, including any containers. *United States v. Wells,* 347 F.3d 280, 287 (8th Cir.2003).

Initially, as discussed earlier, the record does not indicate that the tote was covered. While the testimony lacks specificity, because the tote was opaque and a bag of Morton rock salt could be seen inside the tote, apparently the tote was uncovered. Marasco argues that the encounter was during a Nebraska winter, and it could have been in the pick-up for Marasco's use while driving. Although it was near the end of March and no snow was on the ground that day (Tr. 15:9–10), it is possible that the rock salt was kept to use on ice. However, given the totality of the circumstances involving the strong anhydrous

ammonia odor, the containers that Kennan had often seen on other occasions used for storing materials used in methamphetamine manufacturing (Tr. 22:19–14),[3] the probable cause standard was met. The objection that Kennan lacked probable cause to search the trash bag is denied.

### Page 4—Exigent Circumstances

■ Marasco argues that exigent circumstances relating to Kennan's suspicion of a methamphetamine lab did not justify a search of the pick-up. Under Eighth Circuit law, where officers have probable cause to believe they have found a methamphetamine lab, the volatility of such labs provides an exigent circumstance for justifying a warrantless search. *Kleinholz v. United States*, 339 F.3d 674, 677 (8th Cir.2003). Given the facts discussed earlier, Kennan had probable cause to believe he had discovered a methamphetamine lab, and therefore exigent circumstances existed for a warrantless search of the pick-up. The objection is denied.

### Page 15—Evidence From Trash Pull; Probable Cause for Search Warrant

■ Marasco objects to the conclusion that the evidence collected from the trash pull at 720 1st Avenue alone constituted sufficient probable cause to issue a search warrant for the premises, arguing that the evidence recovered from the trash only showed that methamphetamine had been used in the home at some point and not that methamphetamine was present at the time of the search.

On May 18, 2005, ten large plastic trash bags and four smaller plastic trash bags were recovered, with the help of a trash company, from 720 1st Ave., Plattsmouth, Nebraska. The following items were found:

a Newport lights cigarette box containing 1 corner from a plastic sandwich bag, 2 yellow plastic ziploc baggies, 1 clear plastic ziplock bag; items of venue for Aleta Stalbosky; items of venue for Jerry J. Beuchler; item of venue for Marasco; item of venue for Richard Marasco, 2 pieces of clear rubber tubing; 1 empty 32oz. [sic] can of Acetone; 2 cut white with blue striped straws; 2 cut white hollow pen tube casings; 5 strips of burnt tin foil; a letter scale; 1 hollow Bic pen tube with residue.

(Ex. 1, at 2.)

The affidavit states that a field test of the Bic pen tube revealed the presence of methamphetamine. (*Id.*) The affidavit continued, describing the uses of the following in methamphetamine manufacture: aluminum foil; hollow tubes; Acetone; clear tubing; and gas generators. (*Id.* at 3.) The affidavit reflects that venue items were found to several individuals known by officers to inhabit the home. The information was not stale, as the trash search occurred on May 18, 2005, and the warrant was issued on May 19, 2005. (Ex. 1.)

■ Marasco's argument that the evidence from the trash search alone cannot support a finding of probable cause is rejected. Applying recent Eighth Circuit law, the evidence obtained from the trash search, combined with the various venue items found, and the recency of the search, under the totality of the circumstances is *alone* enough to support a finding of probable cause to issue the search warrant. *United States v. Timley*, 443 F.3d 615, 623–24 (8th Cir.2006) (two trash pulls within a week yielding small and large bags containing marijuana and residue alone constituted sufficient probable cause for issuance of a search warrant); *United*

---

3. Trash bags have been mentioned as one item used in the manufacture of methamphet-

amine. *United States v. Chard*, 115 F.3d 631, 633 (8th Cir.1997).

States v. Briscoe, 317 F.3d 906, 908–09 (8th Cir.2003) (marijuana stems and seeds found in a trash pull alone were a sufficient basis supporting a finding of probable cause to issue a search warrant). The objection is denied.

### Evidence Recovered from 720 1st Avenue—Leon Good Faith Rule

Based on the belief that the search warrant affidavit was so lacking in probable cause, Marasco argues that the good faith rule established in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), does not apply. Marasco contends that, if the Leon good faith rule governs, a recognized exception to the rule applies, i.e., the affidavit was so lacking in probable cause that officers could not reasonably have relied on the affidavit.

The Court disagrees, as Eighth Circuit law clearly states that drug evidence found in a trash search alone is sufficient for a finding of probable cause. Timley, 443 F.3d at 623–24; Briscoe, 317 F.3d at 908–09. It is not necessary to reach the Leon analysis. However, assuming that Leon must be addressed, the Court agrees with Judge Thalken that the Leon good faith rule applies inasmuch as the officers executed the warrant with an objectively reasonable reliance on the issuing judge's determination of probable cause. None of the exceptions to the Leon good faith rule applies.

### Voluntariness of Marasco's Consent to Search Motel Room

Marasco objects to the conclusion on page 17 that his consent for the search of the motel room was voluntary, arguing that his consent was the product of police intimidation.

■ Whether consent to search a residence was voluntarily made must be determined by examining the totality of the circumstances, including " 'both the characteristics of the accused and the details of the interrogation.' " United States v. Chaidez, 906 F.2d 377, 380–81 (8th Cir.1990) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Voluntary consent is " 'the product of an essentially free and unconstrained choice by its maker,' rather than 'the product of duress or coercion, express or implied.' " Id. at 380 (quoting Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041) (citation omitted).

■ The Eighth Circuit Court of Appeals has set out certain factors for consideration in determining whether consent was voluntary. Characteristics of individuals giving consent which should be considered include: 1) age; 2) general intelligence and education; 3) whether the person was intoxicated or under the influence of drugs; 4) whether the person was informed of the right to withhold consent or given Miranda rights; and 5) whether, due to previous arrest(s), the person giving consent was aware of the protections afforded to suspected criminals by the legal system. Id. at 381.

■ Characteristics of the environment in which the consent was given include whether the person who consented, at the time of the consent: 1) was detained and questioned for a long time or a short time; 2) was threatened or physically intimidated by law enforcement officers; 3) relied upon promises or misrepresentations made by law enforcement; 4) was in custody or under arrest; 5) was in a public or a secluded place; and 6) either objected to the search or stood by silently while the search occurred. Id. (citations omitted).

The factors relating to characteristics of the individuals and the environment should not be applied mechanically, and the factors should be viewed as a guide. Id.

Finally, "no single factor is dispositive or controlling." *United States v. Bradley,* 234 F.3d 363, 366 (8th Cir.2000).

■ Applying these factors in the instant case, the Court recognizes that three or four officers in police vests with their guns visible came into the motel room after knocking on the door. Marasco was handcuffed immediately and read his *Miranda* rights prior to being asked for consent to search. However, the evidence also shows that Marasco allowed the officers into the room, appeared "friendly" and "very calm," and did not appear to be under the influence of any substance. (Tr. 45:6, 15–17.) Although Marasco did testify, he chose not to testify as to the voluntariness issue. Marasco presented no evidence indicating that his consent was involuntary. The objection is denied.

### The Effect of Harms's Refusal to Consent to a Search of the Motel Room

■ Marasco argues that the conclusion on page 18 that evidence found in the motel room is admissible against Marasco is in error. Marasco argues that, even though he consented to the search of the room, Harms refused to consent to the same search.

Judge Thalken relied on the following language in *Georgia v. Randolph,* —— U.S. ——, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006):

> The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. The question here is whether such an evidentiary seizure is likewise lawful with the permission of one occupant when the other, who later seeks to suppress the evi-

dence, is present at the scene and expressly refuses to consent. We hold that, in the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid *as to him.*

(Filing No. 44, at 17–18 (citing at *Randolph,* 126 S.Ct. at 1519) (emphasis added).)

Marasco argues that the case relied on by Judge Thalken does not apply. Marasco attempts to distinguish *Randolph* by arguing that it involved a married couple, whereas in his case officers knew that the room was rented to Harms and they had no reasonable basis to assume that Marasco had authority to consent. Alternatively, Marasco argues that if *Randolph* does apply, it is distinguishable because the nonconsenting occupant of the room in *Randolph* was not charged with a crime, unlike the situation in the instant case where Marasco and Harms are codefendants.

■ *Randolph* has been cited for the proposition that when a co-occupant is present and refuses consent to search, the refusal is dispositive *as to that co-occupant* even where the other occupant consents to the search. *See, e.g., United States v. Murphy,* 437 F.Supp.2d 1184, 1192, 2006 WL 1675930, at *7 (D.Kan.2006). Authority to consent to a search is found in cases involving "mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). A person with actual or apparent authority may consent to a search. *Illinois v. Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Marasco has not presented contrary authority. Officers checked with the motel manager, who told them that Marasco had paid for the room, and he

answered the door when officers knocked. Therefore, Marasco had apparent, if not actual, authority to consent to a search of the room.

For these reasons, the objection is denied.

### DEFENDANT HARMS'S OBJECTIONS

Harms objects to the following portions of the Report and Recommendation:

1. p. 16, Part C(1)—the conclusion that the blue scale in item W–5, the coffee filters in item W–7, and item 19 (a blue 2–quart pitcher containing blue liquid) were within the plain view exception to the warrant requirement. Harms argues that officers did not provide a rationale as to why these items were immediately apparent; and

2. p. 18, Part C(4)—the conclusions that Harms only objected to the search of her "stuff," Marasco's consent was sufficient to allow for a search of the remainder of the motel room, and items found are admissible against Marasco but not against Harms.

### Page 16, Part C(1)—Plain View; "Immediately Apparent"

Harms objects to the conclusion that the seizure of the blue scale in item W–5, the coffee filters in item W–7, and item 19 (a blue 2–quart pitcher containing blue liquid) was legal, arguing that the items could not have been seized because their illegal nature was not "immediately apparent" and Sergeant Wood did not provide a reason for their seizure.

■■■ The plain view doctrine allows for a warrantless seizure when the seizing officer does not violate the Fourth Amendment in searching the place where the objects are found, the object's incriminating character is "immediately apparent," and the officer has a lawful right of access to the object. *United States v. Khabeer,* 410 F.3d 477, 482 (8th Cir.2005). The Eighth Circuit Court of Appeals has stated the following with respect to the phrase "immediately apparent":

> "the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary." For an item's incriminating character to be immediately apparent, the police merely need probable cause to believe that the item is contraband. Once that probable cause exists, a plain-view seizure of the item is permissible.

*Skokos v. Rhoades,* 440 F.3d 957, 961 (8th Cir.2006) (citations omitted).

■■■ Coffee filters, scales, and blue colored liquid are items associated with drug trade or manufacture, and specifically methamphetamine manufacture. *United States v. Workman,* 2006 WL 1519638, at *1 (8th Cir.2006) (scale); *United States v. Weston,* 443 F.3d 661, 664 (8th Cir.2006) (blue discoloration on tank valves, indicating anhydrous ammonia); *United States v. Spencer,* 439 F.3d 905, 916 (8th Cir.2006) (coffee filters); *United States v. Dukes,* 432 F.3d 910, 914 (8th Cir.) (coffee filters, bluish corrosion associated with anhydrous ammonia storage), *cert. denied,* — U.S. ——, 126 S.Ct. 2307, 164 L.Ed.2d 827 (2006).

The evidence shows that the scale had residue, and some of the coffee filters had been used and exhibited methamphetamine residue. (Ex. 2.) Officers were investigating a methamphetamine lab, and they had probable cause to believe that the items in question were contraband associated with methamphetamine manufacture. The objection is denied.

*Page 18, Part C(4)—Consent(s) to Search*

■ Harms objects to the conclusions that Harms only objected to the search of her "stuff," and Marasco's consent was sufficient to allow for a search of the remainder of the motel room, and items found are admissible against both Marasco and Harms.

In deciding *United States v. Matlock,* 415 U.S. 164, 169, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court stated that a joint occupant's voluntary consent is valid against the co-occupant, allowing evidence to be admitted against the co-occupant. In *Georgia v. Randolph,* —— U.S. ——, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), the Supreme Court concluded that a physically-present occupant's express refusal of consent is dispositive as to that occupant, regardless of the co-occupant's consent. *Id.* at 1527–28. The *Randolph* Court specifically explained that the *Randolph* holding was not meant to overrule *Matlock. See, e.g., United States v. Crosbie,* 2006 WL 1663667, at *2 (S.D.Ala. June 9, 2006); *United States v. Botchway,* 433 F.Supp.2d 163, 169 (2006).

Officers relied on Marasco's consent to search the room. Recognizing Harms's refusal to consent to the search of her property, the evidence that was found among Harms's "stuff" was suppressed. This result is consistent with *Randolph.* Therefore, the objection is denied.

GOVERNMENT'S OBJECTIONS

The government objects to the following conclusions in the Report and Recommendation: page 18—items W–3, W–4, W–9, W–18, and W–21 are inadmissible as to Harms; page 18—the same items should be admissible as against Harms because she lacked equal control and authority to refuse consent to a search of the room; and page 19—that Harms's statement should be suppressed as a product of an illegal search of her property, arguing: a) the search was legal; and b) even if the search was illegal, her statement was not the fruit of the search.

*Page 18—Exigent Circumstances Despite Harms's Limited Consent*

The government argues that upon entering the room and discovering numerous items in plain view, and knowing that a gas generator and acid were present in the room, officers knew that a methamphetamine lab existed and they had probable cause to arrest the occupants. The government also relies on the volatile nature of methamphetamine labs as an exigent circumstance to allow the warrantless search.

In *Kleinholz v. United States,* 339 F.3d 674 (8th Cir.2003), officers were aware that a methamphetamine lab was in a bedroom of a house. Upon nearing the home, officers smelled ether, a substance known to be used in methamphetamine manufacture. *Id.* at 675. The ether smell, together with other facts, justified the search under the exigent circumstances exception to the warrant requirement. *Id.* at 677.

*Kleinholz* is distinguishable from the instant case. In this case, officers knew a gas generator was present. However, the evidence does not reveal the presence of any odors or that the generator was in use. The record does not show exigent circumstances. The objection is denied.

*Page 18—Items Suppressed as to Harms; Harms's Consent*

The government argues that Harms lacked control over the motel room and did not have authority to refuse consent to search the room. The Court disagrees. The record shows that, although Marasco paid for the room, Harms originally rented the room. Also, both defendants told officers that they shared the room equally and

came and went as they pleased, although Marasco carried the only room key. The objection is denied.

### Page 19—Harms's Statement

The government argues that Harms's statement should not be suppressed as the product of an illegal search. For the reasons stated above, the Court has adopted Judge Thalken's conclusion that the search was illegal. The government argues that Harms's statement was not the fruit of the illegal search.

 The Court must consider the following factors when determining whether an illegal search taints a later statement: the temporal proximity of the illegal search and the statement; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct. *Taylor v. Alabama,* 457 U.S. 687, 691–93, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Applying this test to Harms's case, her statement was given immediately after the search, which was in part legal and in part illegal as to her. Therefore, the temporal proximity was close, and no intervening circumstances were present. Although the record does not indicate flagrant misconduct, the lack of this factor is outweighed by the other factors. *See United States v. McKines,* 933 F.2d 1412, 1429 (8th Cir.1991) (engaging in the same analysis, and concluding that the first two factors outweighed the absence of the third factor). Therefore, the objection is denied.

### CONCLUSION

For the reasons discussed, the Magistrate Judge's Report and Recommendation is adopted.

IT IS ORDERED:

1. The Magistrate Judge's Report and Recommendation (Filing No. 44) is adopted in its entirety;

2. The Statement of Objections to the Report and Recommendation filed by the Defendant, Richard D. Marasco (Filing No. 49) is denied;

3. The Statement of Objections to the Report and Recommendation filed by the Defendant, Angela D. Harms (Filing No. 46) is denied;

4. The Statement of Objections to the Report and Recommendation filed by the government (Filing No. 53) is denied;

5. The Motion to Suppress filed by the Defendant, Richard D. Marasco (Filing No. 24) is denied;

6. The Motion to Suppress filed by the Defendant, Angela D. Harms (Filing No. 26) is: granted as to Items W–3, W–4, W–9, W–18, and W–21 seized from Room 12 of the Offutt Motor Court on August 24, 2005, as described in Exhibit 2 of the supplemental evidentiary hearing; granted as to Harms's August 25, 2005, statement made to Detective Simones; and otherwise denied.

### REPORT AND RECOMMENDATION

THALKEN, United States Magistrate Judge.

This matter is before the court on the motion of defendant Richard D. Marasco (Marasco) (Filing No. 24) to suppress all evidence seized from the search of a pickup truck on March 27, 2005, in Plattsmouth, Nebraska, from the search of the residence at 720 1st Avenue on May 20, 2005, in Plattsmouth, Nebraska, and from the search of a motel room at Offutt Motor Court on August 24, 2005. Defendant Angela D. Harms (Harms) seeks to suppress all evidence seized from the search of a motel room at Offutt Motor Court on August 24, 2005, and any statements she

may have made to law enforcement officers on August 24, 2005 (Filing No. 26). Both Marasco and Harms are charged in an Indictment with a conspiracy to manufacture in excess of 50 grams of methamphetamine in violation of 21 U.S.C. § 846 (Count I), the manufacture of more than 5 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Count II), and the possession of equipment and materials to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6) (Count III).

The court held an evidentiary hearing on the motions to suppress on February 17, 2006. Marasco was represented by Federal Public Defender David R. Stickman and Jay W. Mez. Harms was represented by John D. McDermott. The United States was represented by Assistant U.S. Attorney Thomas J. Kangior. During the hearing, the court heard the testimony of Officer Andrew Kennan (Officer Kennan) of the Plattsmouth, Nebraska Police Department, Sergeant Robert Eric Wood (Sergeant Wood) and Detective Zeb Simones (Detective Simones) of the Bellevue, Nebraska Police Department, and the defendant Marasco. The court received into evidence an application and affidavit for a search warrant and search warrant (Exhibit 1). A transcript (TR.) was prepared and filed in this matter on February 24, 2006 (Filing No. 37).

On March 22, 2006, the U.S. Supreme Court decided the case of *Georgia v. Randolph*, No. 04–1067, 547 U.S. ——, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), wherein the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to police by another resident." *Georgia v. Randolph*, at 1526. Since this precise issue was before the court in the instant case concern-

ing the search of Room 12 of the Offutt Motor Court on August 24, 2005, the court ordered a supplemental evidentiary hearing on the motions to suppress by defendants Marasco and Harms (Filing Nos. 24 and 26). At such hearing, the government was directed to present evidence as to what evidence was seized from the motel room and the location within the room where such evidence was seized. All parties were permitted to present such further evidence and argument as they deemed appropriate in light of the decision of *Georgia v. Randolph*.

A supplemental hearing was held on March 29, 2006. Marasco and Harms were present with their counsel as was counsel for the government. The court heard additional testimony from Sergeant Wood and received into evidence a search inventory form (Exhibit 2). A transcript (TR.) of the supplemental hearing was filed on April 10, 2006 (Filing No. 43). The supplemental hearing transcript was prepared with continuous pagination of the original transcript (Filing No. 37). There was no post-hearing briefing.

## FINDINGS OF FACT

Officer Kennan has been employed as a police officer for the City of Plattsmouth, Nebraska, since October 2002 (TR. 7). He has been assigned to the Metro Clandestine Lab Team for four years and has been certified as a methamphetamine lab specialist in a 40–hour class through the Nebraska State Patrol (TR. 8). Officer Kennan has attended numerous training sessions on the recognition of methamphetamine and has manufactured methamphetamine as part of that training (TR. 8). In such training, Officer Kennan has worked with anhydrous ammonia and is familiar with the odor of anhydrous ammonia (TR. 8). Officer Kennan testified he had encountered approximately thirty

methamphetamine labs in the course of his duties as a law enforcement officer (TR. 8).

Officer Kennan was in uniform and on patrol in a marked patrol vehicle at approximately 2:00 a.m. on March 27, 2005 (TR. 8). Officer Kennan observed a pick-up truck crossing Chicago Avenue onto Second Avenue headed northbound on North 8th Street in Plattsmouth (TR. 9). Officer Kennan believed the driver to be Sean Mauk (Mauk), a person whose license had been suspended for two years (TR. 9). Officer Kennan radioed into dispatch requesting dispatch check to see if Mauk was still on suspension (TR. 9). Dispatch radioed back that Mauk was still on suspension (TR. 10). Officer Kennan began following the pick-up and radioed in the license plate of the pick-up once Officer Kennan closed nearer to the pick-up (TR. 10). As Officer Kennan was following the pickup, the pick-up turned into an alley between First and Main Streets and parked (TR. 10). The pick-up was parked in a residential area behind a residence in which Marasco was living (TR. 15). Officer Kennan drove his patrol vehicle into the entrance of the alley, parked, and got out of the patrol vehicle (TR. 10). Officer Kennan did not activate any flashing lights or sirens on his patrol vehicle (TR. 10–11). As Officer Kennan approached the parked pick-up, he shined his flashlight on the cab of the pick-up and recognized the driver to be Marasco from prior contacts with Marasco (TR. 11). As Officer Kennan walked toward the pick-up, he radioed in a request to dispatch to see if there were any warrants for Marasco (TR. 19). Apparently, there were none (TR. 19). Marasco was getting out of the pick-up after having shut the engine off (TR. 11). Officer Kennan approached Marasco and stated: "Mr. Marasco, I apologize. I actually thought that you were somebody else that was driving under suspension" (TR. 11). As Officer Kennan turned to walk away from the pick-up and go back to his patrol vehicle and leave, Officer Kennan got a strong odor of anhydrous ammonia coming from the bed of the pick-up (TR. 12). The odor stung Officer Kennan's eyes and nostrils (TR. 12).

Since Officer Kennan associated the odor of anhydrous ammonia with the odor associated with methamphetamine labs, Officer Kennan asked Marasco what was in the pick-up that smelled like anhydrous ammonia (TR. 12). Marasco stated he did not know as the truck was not his (TR. 12). Marasco testified that on March 27, 2005, he was driving the pick-up searched by Officer Kennan (TR. 31). The pick-up truck belonged to his roommate, Jed Beuchler, and Marasco had permission from Beuchler to drive the pick-up (TR. 31–32).

Officer Kennan asked Marasco to step back to Officer Kennan's patrol vehicle (TR. 12). At this point in time, another Plattsmouth patrol vehicle driven by Officer John Hardy (Officer Hardy) had arrived and parked next to Officer Kennan's patrol vehicle (TR. 13). The positioning of the police patrol vehicles blocked the egress from the alley onto the street (TR. 17). Marasco walked to Officer Kennan's patrol vehicle and stood next to Officer Hardy (TR. 13). Officer Kennan flashed his flashlight into the open bed of the parked pick-up and observed a black trash bag, a Rubbermaid tote container, and a black bucket containing a bag of Morton rock salt (TR. 13). Officer Kennan believed the rock salt, as well as the other items in the pick-up, to be a precursor used in manufacturing methamphetamine (TR. 13; 22). Officer Kennan carefully opened the black bag to see if the bag was the source of the anhydrous ammonia odor (TR. 13). Officer Kennan testified he was concerned for his and others' safety if anhydrous ammonia was not contained properly (TR. 13). Inside the bag, Officer Ken-

nan found a five gallon white bucket with a tinted blue liquid (TR. 14). There was a white sediment in the liquid and the odor of anhydrous ammonia was stronger (TR. 14). At this point, Officer Kennan believed he observed the components of an active methamphetamine lab and seized the items (TR. 26).

On May 19, 2005, Detective David Walker (Detective Walker) of the Plattsmouth Police Department applied for a search warrant for the premises at 720 1st Avenue in Plattsmouth, Nebraska (Exhibit 1). Therein Detective Walker set forth his experience as a certified LAB Technician, Site Safety Officer, and his assignment to the Metro Clan Lab Team (Exhibit 1). Detective Walker detailed the specifics of a trash pull from the residence of 720 1st Avenue containing delineated items of drug and methamphetamine paraphernalia (Exhibit 1). Some of the items were tested and proved positive for the presence of methamphetamine (Exhibit 1). Detective Walker detailed the significance of the items seized as they may relate to methamphetamine trafficking (Exhibit 1). Based on the application and affidavit, a county judge in Cass County, Nebraska, issued a search warrant for the premises (Exhibit 1). The search warrant was executed on May 20, 2005, and numerous items were seized as listed in the Return and Inventory attached to the search warrant (Exhibit 1).

On August 24, 2005, Sergeant Wood and members of his Special Investigations Unit (Unit) were driving around the city of Bellevue, Nebraska, looking for suspicious activity which may involve drug trafficking stemming from active narcotics investigations or complaints of narcotics activity (TR. 36). The Unit investigates narcotics cases, gun cases, and gang activity (TR. 36). The Unit started on Fort Crook Road to the south of the Old Towne area,

and particularly at the Offutt Motor Court (TR. 36). Sergeant Wood was driving an unmarked police vehicle (TR. 37). Unit Detectives John Brazda, Zeb Simones, and Shaun McAlpin were in separate vehicles and participating in the operation (TR. 37). Sergeant Wood noticed a vehicle bearing 20–county license plates parked behind the Offutt Motor Court (TR. 37). The car raised Sergeant Wood's suspicions because the Unit previously recovered methamphetamine labs from this motel and several of those recoveries were from individuals from the Plattsmouth area in Cass County (20–county) (TR. 37–38).

Sergeant Wood called Detective Simones and requested Detective Simones to run the license plate observed by Sergeant Wood (TR. 38). Using his laptop computer which was connected to the statewide database, Detective Simones ran the license plate (TR. 38; 61). Detective Simones's check determined that the 20–county plates were registered to Richard Marasco of Plattsmouth, that there was an outstanding felony warrant for Marasco; and that Marasco had a past drug history (TR. 38–39; 61–62). Detective Simones contacted the Plattsmouth Police Department to determine who else other than Marasco could be driving the 20–county vehicle (TR. 39). When informed that Marasco had a son but that the son was in custody and that Marasco had previous arrests for manufacturing methamphetamine in Cass County, Sergeant Wood requested Detective Simones to meet with Sergeant Wood (TR. 39).

Detective Simones met with Sergeant Wood at the Offutt Motor Court, and Detective Simones was able to access booking photographs of Marasco on Detective Simones's laptop computer (TR. 40). At approximately 9:30 p.m., as the detectives were surveilling the motel room at the Offutt Motor Court, a white Toyota 4Run-

ner arrived and parked next to Marasco's vehicle (TR. 40). An older white male, later identified as Marasco, and a younger white female passenger, later identified as Harms, got out of the 4Runner and entered Room 12 of the motel (TR. 40–41). Sergeant Wood sent Detective Simones to the font desk of the motel to find out who was registered in Room 12 (TR. 41). Detective Simones learned from the manager of the motel that Marasco was not registered as one of the renters of the room (TR. 62). However, after being provided a description of Marasco, the motel manager suspected Marasco was in Room 12, which was rented by an Angela Harms (TR. 63). Detective Simones checked Harms's criminal history and determined that Harms owned a white Toyota 4Runner and Harms had a prior arrest for methamphetamine (TR. 63). Detective Simones then relayed this information to Sergeant Wood (TR. 63).

The officers, i.e., Sergeant Woods, Detectives Brazda, McAlpin and Simones of the Bellevue Police Department and Detective Dave Walker of the Plattsmouth Police Department, then converged on Room 12 of the Offutt Motor Court (TR. 42). Detective Simones knocked on the door which was answered by Marasco (TR. 42). Marasco was advised the officer had a warrant for Marasco's arrest and asked Marasco to step outside (TR. 64). Instead, Marasco stepped back into the room (TR. 42; 64). Sergeant Wood, Detective Simones, and another detective stepped into the room and placed handcuffs on Marasco (TR. 42). Sergeant Wood informed Marasco that Marasco was under arrest and asked Marasco if there was anything on him which might be dangerous (TR. 42–43). Marasco said no (TR. 43). Sergeant Wood than asked Marasco if there was anything that might be dangerous to the officers in the room, such as chemicals (TR. 42). Marasco stated he had some acid (TR. 43).

When the officers entered the room, Harms was seated in a chair (TR. 42). Detective Simones asked Harms to step outside, which she did (TR. 65). Detective McAlpin stood in the doorway while Detective Simones talked with Harms (TR. 65). Detective Simones asked Harms who rented the room (TR. 67). Harms told Detective Simones that she had rented the room but that Marasco recently went to the manager's office and paid for another week's rent (TR. 67). Harms said she and Marasco shared the room equally and both could come and go as they pleased (TR. 67). Detective Simones asked Harms for permission to search the room (TR. 67). Harms stated she would rather not have the officers looking through her stuff (TR. 67–68; 100). Detective Simones relayed this information to Sergeant Wood (TR. 68).

While Detective Simones talked with Harms outside, Sergeant Wood searched Marasco's person incident to Marasco's arrest and some bags of methamphetamine were found (TR. 44; 54). Sergeant Wood advised Marasco of his *Miranda* rights using a *Miranda* advice card (TR. 44; 52). Sergeant Wood then asked Marasco if the officers could search the room and advised Marasco he did not have to give consent (TR. 44; 59). Marasco said they could search (TR. 44). Marasco also told Sergeant Wood that there was a gas generator as well as some acid in the room (TR. 44). Marasco did not appear to be under the influence of any drug, had no difficulty in understanding the officer's questions, and posed a friendly demeanor (TR. 45).

Detective Simones went back into the motel room and talked with Marasco (TR. 68). When asked who had a key to the room, Marasco stated he had the only key and kept the key with him at all times

(TR. 68). Marasco said Harms had originally rented the room but that he actually paid for the room (TR. 68). Marasco said he and Harms shared the room and they both came and went from the room as they pleased (TR. 68).

Based on Marasco's consent to search, the officers searched the motel room (TR. 47). Numerous items of methamphetamine manufacturing paraphernalia, actual methamphetamine, syringes and other methamphetamine paraphernalia were found (TR. 48). A gray plastic container and plastic bags with methamphetamine were found in Marasco's front jeans' pocket (Exhibit 2—Item W–1; TR. 95); black leather pouch with methamphetamine found in Marasco's front pocket (Exhibit 2—Item W–2; TR. 95); bag with methamphetamine and glass vial found on bed—the contents of the bag not readily apparent (Exhibit 2—Item W–3; TR. 95); black tin containing 3 bags of methamphetamine and "tooter" found near a purse on the bed—items not observed until after the commencement of the search of the room (Exhibit 2—Item W–4; TR. 95–96); three glass pipes, foil, and blue plastic scale with residue observed prior to the room search on the night stand (Exhibit 2—Item W–5; TR. 89); container with some coffee filters found on the night stand after the room search began (Exhibit 2—Item W–6; TR. 96); used coffee filters with residue observed in plain view on a table (Exhibit 2—Item W–7; TR. 90); two red buckets, plastic funnels and coffee filters found in a cabinet under the sink at the north wall after the room search began (Exhibit 2—Item W–8; TR. 96); blue purse containing numerous unused baggies found on the bed after the room search began (Exhibit 2—Item W–9; TR. 97); three foils, two used and one with methamphetamine found on the floor by night stand found after the room search began (Exhibit 2—Item W–10; TR. 97); bag containing numerous unused baggies found in a side pocket of a duffel bag under the TV stand after the room search began (Exhibit 2—Item W–11; 98); can of Sunnyside acetone found on the floor near the TV stand after the room search began (Exhibit 2—Item W–12; TR. 98); electrical stir stick, plastic spoon, coffee filters, and a glass jar of Coleron fuel found on the top shelf above the sink after the room search began (Exhibit 2—Items W–13 and W–14; TR. 98); boxes of pseudoephedrine and an empty can of acetone in a garbage sack found under the TV table after the room search began (Exhibit 2—Items W–15 and W–16; TR. 98); plastic sports bottle with tubing and sample found under the sink after the room search began (Exhibit 2—Items W–17 and W–1 7A; TR. 98); black/blue zippered pouch with syringes found in the purse on the bed after the room search began (Exhibit 2—Item W–18; TR. 93–94); plastic 2–quart pitcher with blue liquid observed next to the sink along the north wall prior to the start of the room search (Exhibit 2—Items W–19 and W–19A; TR. 90); bottle containing acid found under the sink after the room search began (Exhibit 2—Item W–20); and a black bag containing numerous syringes found in the purse on the bed after the room search began (Exhibit 2—Item W–21).

Detective Simones was informed that there were drug related items in the room that could be linked to Harms (TR. 68). Detective Simones then went back outside and advised Harms of her *Miranda* rights from a card in his wallet (TR. 68–69; 73). Thereafter, Harms made incriminating statements (TR. 72).

### LEGAL ANALYSIS

#### A. Search of the Pick-up on March 27, 2005

Marasco challenges the search of the pick-up on March 27, 2005, by officers of

the Plattsmouth Police Department. He asserts the search was conducted without a warrant, without Marasco's consent, and without probable cause. The government challenges Marasco's standing to object to the search of the pick-up. However, the government also asserts that any detention of Marasco and search of the pick-up was justified by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), by having probable cause to believe an offense was being committed, or by the presence of exigent circumstances warranting the search.

### 1. Standing

To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); *United States v. Boyster,* 436 F.3d 986, 992 (8th Cir.2006). The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois,* 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); see also *Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Barragan,* 379 F.3d 524, 529–30 (8th Cir.2004) (**quoting** *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir.1994)).

> The Eighth Circuit has recognized that: The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized. A court must determine: (1) whether the petitioner has asserted a subjective expectation of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable.

*United States v. Stallings,* 28 F.3d 58, 60 (8th Cir.1994) (internal citations omitted). "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Barragan,* 379 F.3d at 529. Therefore, the court "must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." *Gomez,* 16 F.3d at 256. The Eighth Circuit has explained:

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.*

The pick-up in issue was owned by and registered to Jerry Beuchler and was parked behind a house at 720 1st Avenue in Plattsmouth where Beuchler resided with Marasco. Marasco testified he had Beuchler's permission to drive the pick-up on the evening of March 27, 2005. Marasco further testified he had driven the pick-up on several occasions previous to March 27th and did mechanical work on the pick-up for Beuchler. The government did not contradict Marasco's assertions. The court finds Marasco has carried his burden he had a reasonable expectation of privacy in the pick-up on the evening of March 27, 2005.

### 2. Encounter with Marasco in the Alley

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, *see, e.g., Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Angell*, 11 F.3d 806 (8th Cir.1993), *cert. denied*, 512 U.S. 1239, 114 S.Ct. 2747, 129 L.Ed.2d 865 (1994); *United States v. Robinson*, 984 F.2d 911 (8th Cir.1993); *United States v. Gilbert*, 936 F.2d 377 (8th Cir.1991);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, *see, e.g., United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Weaver*, 966 F.2d 391 (8th Cir.), *cert. denied*, 506 U.S. 1040, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992); *United States v. Galvan*, 953 F.2d 1098 (8th Cir.1992); and

(3) physical arrests, which must be supported by probable cause. *U.S. Const. amend. IV.*

In this case, Officer Kennan did not stop Marasco while Marasco was driving the pick-up. Officer Kennan encountered Marasco after Marasco had driven into the alley and parked the pick-up behind the residence in the alley. Officer Kennan met Marasco after Marasco had gotten out of the pick-up. While Officer Kennan's police cruiser may have been parked at the entrance to the alley which would have impeded Marasco if Marasco had wanted to leave in the pick-up, the emergency lights were not engaged on Officer Kennan's police cruiser and there was no evidence Marasco wanted to get back into the pick-up and leave the area.

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification—so long as the officer does not convey a message that compliance with his request is required. *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382; *see also United States v. Drayton*, 536 U.S. 194, 200–01, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required. *Id.* (*quoting California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). "It is well established that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place ... [and] putting questions to him if the person is willing to listen." *United States v. Green*, 52 F.3d 194, 198 (8th Cir.1995) (citations omitted). A request for information does not turn consensual questioning into an investigatory stop. *United States v. Pena–Saiz*, 161 F.3d 1175, 1177 (8th Cir.1998); *United States v. Poitier*, 818 F.2d 679, 682–83 (8th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988).

In this case Officer Kennan apologized to Marasco as he approached Marasco and was about to walk away before detecting the anhydrous ammonia odor coming from the bed of the pick-up. Accordingly, the court finds the initial encounter between Officer Kennan on the evening of March 27, 2005, was purely consensual and not an investigatory stop or seizure.

### 3. Detection of the Anhydrous Ammonia Odor

Officer Kennan testified as to his experience in investigating methamphetamine

labs. He further testified he detected the odor of anhydrous ammonia as he walked past the bed of the pick-up Marasco had parked in the alley. Such detection constituted reasonable suspicion of ongoing criminal activity and justified his further looking into the open bed of the pick-up. *Kleinholz v. United States,* 339 F.3d 674, 677 (8th Cir.2003) (smell of ether alone supported probable cause to search); *United States v. Clayton,* 210 F.3d 841, 845 (8th Cir.2000) (noting "plain smell" rule supporting search after odor associated with methamphetamine production). Officer Kennan's observation of the amalgamation of materials which were in plain view in the bed of the pick-up together with the anhydrous ammonia odor constituted probable cause of methamphetamine manufacturing and justified his looking into the closed bag in the bed of the pick-up. Consequently, Officer Kennan's seizure of the materials in the pick-up bed was justified under the Fourth Amendment based upon probable cause. *See Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

### 4. Exigent Circumstances

The government also argues an alternative rationale for the search of the pick-up bed was due to exigent circumstances. Under the "exigent circumstances" exception, "the warrant requirement is suspended 'when—in the press of circumstances beyond a police officer's control—lives are threatened, a suspect's escape looms, or evidence is about to be destroyed.' " *United States v. Johnson,* 12 F.3d 760, 764 (8th Cir.1993) (citations omitted). "The exigent circumstances exception to the warrant requirement is narrowly drawn." *United*

*States v. Ball,* 90 F.3d 260, 263 (8th Cir. 1996). The government bears the burden of establishing that exigent circumstances existed. *Id.* An exigency must be assessed in light of the totality of the circumstances. *United States v. Wihbey,* 75 F.3d 761, 765 (1st Cir.1996). The critical time for determining whether an exigency exists "is the moment of the warrantless entry by the officers onto the premises of the defendant." *United States v. Morgan,* 743 F.2d 1158, 1162 (6th Cir.1984). The exigent circumstances inquiry is limited to the objective facts of what a reasonably experienced police officer would believe at the time of the search. *United States v. Kuenstler,* 325 F.3d 1015, 1021 (8th Cir. 2003).

Officer Kennan, an experienced officer in investigating methamphetamine labs, testified that a strong odor of anhydrous ammonia is indicative of such a lab. "The dangers created by methamphetamine labs can justify an immediate search because of exigent circumstances '[d]ue to the volatile nature of such labs.' " *United States v. Lloyd,*396 F.3d 948, 954 (8th Cir.2005) (*citing Kleinholz,* 339 F.3d at 677). Officer Kennan was entitled to conduct a limited search without a warrant to determine the presence of volatile chemicals used in a methamphetamine lab operation. *See United States v. Walsh,* 299 F.3d 729, 734 (8th Cir.2002).

Thus, Officer Kennan did not violate Marasco's Fourth Amendment rights in searching the bed of the pick-up and seizing the items found as Officer Kennan had probable cause of ongoing criminal activity and the area to be searched was a motor vehicle. Furthermore, Officer Kennan's beliefs concerning the odor he detected constituted exigent circumstances under which he could conduct the search of the pick-up bed under his community caretaker functions of a police officer when deal-

ing with such volatile materials. Such functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *United States v. Smith,* 162 F.3d 1226 (8th Cir.1998).

## B. May 20, 2005 Search of the Residence at 720 1st Avenue

The search of the residence at 720 1st Avenue in Plattsmouth on May 20, 2005, was conducted pursuant to a search warrant issued by a judge of the Cass County Court. Marasco asserts the affidavit in support of the search warrant did not contain sufficient probable cause for the issuance of the warrant.

An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, Search and Seizure, § 3.7(d) at 412 (4th ed.2004). As the Supreme Court stated in *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983): "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* Thus, when viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. *See id.; United States v. Etheridge,* 165 F.3d 655, 656 (8th Cir. 1999). "The duty of the judge issuing a search warrant is to make a 'practical, common-sense decision' whether, considering all the circumstances, a reasonable person could have reason to suspect that evidence would be discovered.... Probable cause is a fair probability that contra-

band evidence of a crime will be found in the location to be searched." *United States v. LaMorie,* 100 F.3d 547, 552 (8th Cir.1996). *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

In his affidavit, Detective Walker based his request for a search warrant on the results of a trash pull on May 18, 2005. Detective Walker asserted:

> On May 18th, 2005 Det. Walker conducted a trash pull at 720 1 st Ave. Plattsmouth, Cass County, NE. With the assistance of a trash company, Det. Walker recovered (10) large plastic trash bags, and (4) smaller plastic trash bags.
>
> Det. Walker, Det. Smith, and Inv. Watson conducted a hand search of the trash bags and located the following items: a Newport Lights cigarette box containing 1 corner from a plastic sandwich bag, 2 yellow plastic ziplock baggies, 1 clear plastic ziplock bag; items of venue for Aleta Stalbosky; items of venue for Jerry J. Buechler; item of venue for Marasco; item of venue for Richard Marasco, 2 pieces of clear rubber tubing; 1 empty 32oz. can of Acetone; 2 cut white with blue striped straws; 2 cut white hollow pen tube casings; 5 strips of burnt tin foil; a letter scale; 1 hollow Bic pen tube with residue.
>
> Det. Smith field-tested the Bic pen tube, which revealed a positive presence of Methamphetamine.

**See** Exhibit 1. Other than the results of the trash pull, Detective Walker set forth his experience in drug investigations, the significance of the items found in the trash pull, and venue matters. Marasco asserts the trash pull, *per se,* which constituted the cornerstone for probable cause did not justify the issuance of the search warrant.

The Eighth Circuit has repeatedly held that affidavits for search warrants based

entirely upon evidence garnered from garbage may be sufficient for the issuance of a search warrant for the premises. See *United States v. Hernandez Leon,* 379 F.3d 1024, 1028 (8th Cir.2004); *United States v. Sumpter,* 669 F.2d 1215, 1221 (8th Cir.1982); *United States v. Reicherter,* 647 F.2d 397, 398 (3d Cir.1981); *Magda v. Benson,* 536 F.2d 111, 112 (6th Cir. 1976). For example, the discovery of marijuana seeds and stems in the defendant's trash was alone sufficient to establish probable cause to search a house in *United States v. Briscoe,* 317 F.3d 906, 908–09 (8th Cir.2003).

Even assuming *arguendo,* that probable cause was lacking in sufficiency, the *Leon* good faith exception would allow the admissibility of the evidence seized. See *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405 (1984). In *Leon,* the Supreme Court held that "evidence obtained pursuant to a search warrant should not be excluded where the officers executed the warrant 'with an objectively reasonable reliance on the magistrate's determination of probable cause.'" *United States v. LaMorie,* 100 F.3d 547, 555 (8th Cir.1996). There are four exceptions to this good faith rule:

> (1) where the issuing judicial officer was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing officer "wholly abandoned his judicial role;" (3) where the affidavit supporting the warrant contained so few indicia of probable cause "as to render official belief in its existence entirely unreasonable;" and (4) where the warrant itself is so facially deficient that no executing officer could reasonably presume it to be valid.

*Id.* (internal citations omitted). None of those exceptions are present in this case.

Marasco's objections to the affidavit in this case should be rejected and his motion to suppress the evidence seized from 720 1st Avenue on May 20, 2005, should be denied.

## C. Search of Room 12, Offutt Motor Court on August 24, 2005

Both Marasco and Harms assert there was no valid consent for the police officers to search Room 12 of the Offutt Motor Court on the evening of August 24, 2005. The government asserts otherwise and also asserts there were exigent circumstances warranting the search of the motel room. Further, the government asserts some of the items seized were within plain view or on Marasco incident to Marasco's arrest.

### 1. Items in Plain View

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Beatty,* 170 F.3d 811, 814 (8th Cir.1999). When the police officers were legally in Room 12 to place Marasco under arrest, they observed in plain view the following: Item W–5 (3 glass pipes, foil, and a blue plastic scale with residue observed on the night stand), Item W–19 (a plastic 2–quart pitcher containing a blue liquid observed next to the sink along the wall); and Item W–7 (used coffee filters containing residue observed on a table by a TV against the wall). The officers were legally inside the room to arrest Marasco and observed the above-mentioned items in plain view. Those items were seized and are admissible in evidence against both Marasco and Harms.

## 2. Items Seized Incident to Marasco's Arrest

Contemporaneously with Marasco's arrest on the outstanding warrant, the officers could search Marasco's person and that area under his immediate control where he might obtain a weapon or destroy evidence. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Thus the items seized from Marasco's pockets, Item W–1 (plastic bags containing methamphetamine) and Item W–2 (leather pouch containing methamphetamine and marijuana), are readily admissible in evidence. Those items are admissible in evidence regardless of any consent issue pertaining to the search of Room 12.

## 3. Marasco's Consent to Search Room 12

A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion. *United States v. Johnson,* 58 F.3d 356, 357–58 (8th Cir.1995). Furthermore, the government must establish the voluntariness of the consent by the preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Miller,* 20 F.3d 926, 930 (8th Cir.1994). Some characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. *United States v. Hathcock,* 103 F.3d 715, 719–20 (8th Cir.), cert. denied, 521 U.S. 1127, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997). The court can also look at the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual stood by silently while the search occurred. *Id.*

From the evidence presented at both hearings, the court finds Marasco's consent to be voluntarily given. Marasco argues that even if his consent was voluntarily given, Harms did not give consent to search the room. Marasco argues since Harms was present and objected, her objection precluded the search of the room as to any occupant under the recent Supreme Court decision in *Georgia v. Randolph.* Marasco misconstrues the holding in *Georgia v. Randolph.* Therein Justice Souter wrote:

> The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. The question here is whether such an evidentiary seizure is likewise lawful with the permission of one occupant while the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent. We hold that, in the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid *as to him.*

*Georgia v. Randolph,* 126 S.Ct. at 1518 (internal citations omitted) (emphasis added). Accordingly, while Harms may have objected or refused consent to search the room, the evidence is still admissible against Marasco who voluntarily consented to the search.

### 4. Harms's Consent to Search Room 12

When asked for consent to search Room 12, Officer Simones testified as to Harms reply: "I can't say that this was an exact quote, but it was very similar to I would rather not have you looking through *my stuff*" (TR. 67–68) (emphasis added). See also TR. 103–104. Ordinarily, the search of the room with the consent of the co-occupant Marasco would lead to the admission of the evidence found against both Marasco and Harms. However, since *Georgia v. Randolph*, the evidence found in the room would not be admissible against Harms if she objected to the search. In this case, Harms only objected to the search of "her stuff." While Harms did not specifically consent to the search of the rest of the room other than "her stuff," Marasco's consent to search the entire room would suffice for the officers to search the room and such evidence, other than from "her stuff," would be admissible against both Marasco and Harms. Compare *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). When asked if there were any items in the room that readily appeared to belong to Harms, Sergeant Wood stated that there was a purse lying on the bed and there were some craft-type items along the west wall (TR. 93). Any items seized from Harms' purse would not be admissible against her. Examining the items from the inventory (Exhibit 2) in light of the officers' testimony concerning the seizure, the courts concludes the evidence must resolve in favor of Harms that "her stuff" could constitute those items noted in Items W–3, W–4, W–9, W–18, and W–21. Such items would be inadmissible against her. The remaining items would be admissible against her.

### 5. Harms's Statements

Harms was advised of her *Miranda* rights by Detective Simones. Harms does not dispute such advice, nor does she fault the adequacy of the advice (TR. 73–74). Harms only asserts her statements were the fruit of the poison tree, i.e., the illegal search of "her stuff." As such the statement should be excluded under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Based on Detective Simones testimony that after being told by Sergeant Wood that there were some items in the room that were drug related and that such items were linked to Harms, he advised Harms of her *Miranda* rights. The court finds Harms's statement to be the product of an illegal search as to "her stuff." Accordingly, Harms's statement should be excluded from evidence under *Wong Sun*.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

1) Marasco's motion to suppress (Filing No. 24) be denied; and

2) Harms's motion to suppress (Filing No. 26) be granted as to Items W–3, W–4, W–9, W–18, and W–21 seized from Room 12 of the Offutt Motor Court on August 24, 2005, as described in Exhibit 2 of the supplemental evidentiary hearing, granted as to Harms's statement made to Detective Simones on August 25, 2005, but otherwise denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to the Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of the Report and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any

objection may be deemed an abandonment of the objection.

May 2, 2006.